UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 2005-11348 and
NO. 2005-11603 (Consolidated)

JOSEPH SCHMITT,
      Plaintiff,

v.

ROBERT MURPHY, <u>ET</u> <u>AL</u>.,
      Defendants.

---

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS, OR,
IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

---

## INTRODUCTION

The Plaintiff, *pro se* inmate Joseph Schmitt is an inmate lawfully committed to the Massachusetts Department of Correction ("DOC") at the Massachusetts Treatment Center ("MTC").[1] The Plaintiff filed this action against DOC employees Robert D. Clauss, David Leonard, Mark Dare, Steven Fairly, Robert Murphy, Robert J. Waitkevich, Kathleen M. Dennehy, and Timothy Hall.[2] In his Complaint, the Plaintiff alleges that the Defendants improperly confiscated certain personal items. The Defendants moved to dismiss the Complaint on April 22, 2008. *See* Document No. 54. The Defendants filed a second motion to dismiss, in response to a request of the Court, on July 14, 2008. *See* Document No. 58. On March 30, 2009, the Court dismissed several claims, including all claims against Dennehy, Leonard, Dare, Fairly, and Hall.

---

[1] The Plaintiff, a Sexually Dangerous Person committed to the MTC under G.L. c. 123A, is an "inmate" as the term is defined by G.L. c. 124, § 1 (i).

[2] Each Defendant, when referenced individually, will hereinafter be referred to by his or her surname.

The remaining DOC Defendants (Murphy, Clauss, Waitkevich, and MacEachern) hereby move to dismiss the complaint or, in the alternative, for summary judgment in their favor.

**FACTS**

The Plaintiff's claims arise out of two separate incidents, each occurring in 2005.

**A.   Confiscation of $800.00 Money Order.**

On February 7, 2005, Superintendent Murphy approved an "Ingoing/Outgoing Non-Privileged Mail Monitor" pursuant to 103 CMR 481 - Inmate Mail.[3] *Exhibit A*, Mail Monitor, dated February 7, 2005. The mail monitor was necessary because of the Plaintiff's ongoing involvement with a criminal enterprise involving the fraudulent filing of federal tax returns. *Exhibit B*, Memo from Clauss to Murphy, dated February 3, 2005 (redacted). On or about April 1, 2005, the MTC received a letter addressed to the Plaintiff. *Exhibit C*, Memo of Invesigation, dated April 4, 2005 (redacted). The letter came from Lillian Bates, and contained a money order in the amount of $800.00. *Exhibit C*. On April 7, 2005, MacEachern, then the Deputy Superintendent of Operations for the MTC, sent a letter to Ms. Bates, informing her that the letter and money order were being held as evidence in a pending investigation. *Exhibit D*, Letter from MacEachern to Bates, dated April 7, 2005. On June 3, 2005, the Plaintiff wrote to MTC Superintendent Robert Murphy, asking about the status of the money order. *Exhibit E*, Letter from Schmitt to Murphy, dated June 3, 2005. Superintendent Murphy responded on June 13, 2005, explaining that the money order was returned to Ms. Bates. *Exhibit F*, Letter from Murphy to Schmitt, dated June 13, 2005. A copy of the letter from Ms. Bates and the money order were

---

[3] A superintendent is permitted to allow the reading/inspection of incoming and outgoing non-privileged mail "only to prevent interference with institutional goals of security, order, discipline, or if it might facilitate, encourage or instruct in criminal activity…" 103 CMR 481.15 (2). *See also* 103 MTC 481 - MTC Procedural Attachment to 103 CMR 481 - Inmate Mail, ¶ VIII (b). "Upon the superintendent deeming the facts to be sufficient that the security of the institution, the orderly running of the institution, the physical safety of an individual is threatened or when necessary to protect legitimate governmental interests, he may authorize the reading of non-privileged mail."

copied and retained.  *Exhibit G*, Money Orders and Letters.  In response to discovery, the Plaintiff has refused to answer describe his relationship with Ms. Bates, invoking his 5th Amendment rights.  *Exhibit H*, Plaintiff's Answers to Defendants' First Set of Interrogatories to Plaintiff, Joseph Schmitt, dated June 29, 2009.  The Plaintiff has similarly refused to answer any questions regarding his involvement in the above-mentioned tax scam.  *Exhibit H*.

**B.     Confiscation of Items from Plaintiff's Cell in May, 2005.**

On May 17, 2005, Inner Perimeter Security officers conducted an investigation, into a fraudulent MCLS check that had been made out to the Plaintiff.  *Exhibit I*, Memo of Investigation, dated May 27, 2005.  The investigation included an interview with the Plaintiff.  *Exhibit I*.  At the conclusion of the interview, the Plaintiff alleged that he was being extorted by other MTC residents.  He explained that he had been making payments to certain MTC residents, by fraudulently submitting charge slips and then sending the money to fictitious addresses and marking the envelopes as "legal mail."  *Exhibit I*.  The Plaintiff explained that the envelope containing the money would be returned to sender, and since the mail officers do not inspect legal mail, the money would be returned to him.  *Exhibit I*.  The Plaintiff then explained that he had proof of the extortion in an envelope in his cell.  *Exhibit I*.  In order to investigate further, the Plaintiff was transferred from his cell in the MTC to the Minimum Privilege Unit ("MPU").  While the Plaintiff was in MPU, his property was searched, as he suggested, and several items were confiscated by Inner Perimeter Security ("IPS").  The confiscated items were itemized in a letter from Inner Perimeter Security Officer Robert Clauss dated May 23, 2005. *Exhibit J*, Memo to Murphy, dated May 23, 2005.[4]  The confiscated items included:

- 1 address book containing names, suspected addresses of relatives/acquaintances of residents and social security numbers of residents of the MTC;

---

[4] Note that Exhibit J indicates that it is a memo to Joseph Schmitt.  This is a typographical error.  This memo was delivered from Claus to Superintendent Murphy, and was not delivered to the Plaintiff.

- 1 white envelope with 2004 1040 tax form filled out in the Plaintiff's name listing a return address in Cambridge, and a 1099 form filled out in the Plaintiff's name listing a return address in Medford;
- 1 2004 1040A tax book;
- 1 2004 1040EZ tax book;
- 1 2003 1040EZ tax form;
- 1 2003 1099 Copy B form;
- 3 pages torn out of a tax form book;
- 1 manila envelope with a 2004 1099 tax form enclosed;
- 1 magazine photo of a young boy taped to a piece of cardboard;
- 1 National Geographic magazine cover enclosed with numerous magazine cut-outs of pre-adolescent children;
- 1 magazine picture of a young boy fishing with others (found inside envelope labeled family photos);
- 1 magazine picture with nude photos of adult women;
- 1 sheet of white, lined paper hand-written names and social security numbers of four MTC residents;
- 2 2004 1040EZ forms;
- 1 2004 1099 tax form;
- 1 manila envelope that was originally sent to an attorney, but was returned due to an insufficient address, containing an issue of TIME magazine containing a photo of a nude child.

Upon his return to his cell, the Plaintiff noted that these items, identified by the Plaintiff as a personal address book, a family photo, and two tax forms, had been confiscated. *See* Complaint 05-11603. The Plaintiff was notified that certain items were confiscated on May 20, 2005. *See Exhibit K*, Memo from Clauss to Schmitt, dated May 20, 2009. The Plaintiff wrote several letters regarding these items, and various DOC officials responded to his requests. *See Exhibit L*, Letters from Schmitt, May 27, 2005 and June 3, 2005. The Plaintiff was informed that the investigation was ongoing, and that at the completion of the investigation, the status of the items would be addressed. *See Exhibit M*, Letters from Waitkevich and Murphy, June 1, 2005 and June 7, 2005. On July 11, 2005, Superintendent Murphy provided the Plaintiff with an itemized list of confiscated items. *See Exhibit N*, Letter from Murphy to Schmitt, dated July 11, 2005. On July 25, 2005, the Plaintiff filed the instant case, seeking the return of his items and other remedies. *See* Complaint 05-11603.

**ARGUMENT**

A motion to dismiss for failure to state a claim under Fed R. Civ. P. 12(b)(6) will be granted if it appears to a certainty that the plaintiff would be unable to recover under any set of facts. *Gonzalez-Bernal v. United States*, 907 F.2d 246, 258 (1st Cir. 1990). A court ruling on a motion to dismiss must accept the factual allegations of the Complaint as true and draw all reasonable inferences in the non-moving party's favor. *Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 37 (1st Cir. 1991).

Alternatively, summary judgment is properly granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Woodman v. Haemonetics Corp.,* 51 F.3d 1087, 1091 (1st Cir. 1995). The moving party bears the initial burden of demonstrating the absence of a material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once done, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which he would bear the ultimate burden of proof at trial." *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998).

**I.   ALL OF PLAINTIFF'S CLAIMS ARE SUBJECT EITHER TO DISMISSAL OR SUMMARY JUDGMENT IN DEFENDANTS' FAVOR.**

Mass. R. Civ. P. 12(b)(6) requires the dismissal of a complaint when it, "fails to state a claim upon which relief can be granted." Similarly, Rule 56(b) and (c) entitle a defendant to summary judgment when, "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."

A party moving for summary judgment who does not have the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence that

negates an essential element of the opponent's case, "by demonstrating that proof of that element is unlikely to be forthcoming at trial." *Flesner v. Technical Communications Corp.*, 410 Mass. 805, 809 (1991*)*; *see Kourouvacilis v. General Motors Corp.*, 410 Mass. 706, 716 (1991). ". . .[I]f the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat [the] motion." *Pederson v. Time, Inc*., 404 Mass. 14, 17 (1989). "[T]he opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment." *LaLonde v. Eissner*, 405 Mass. 207, 209 (1989).

Following the Court's ruling of June 30, 2009, as clarified on May 5, 2009, the only remaining claims in this case relate to (1) the First Amendment Claim for interference with his mail, (2) the procedural due process claim relating to the confiscation of the $800.00 money order, and (3) the procedural due process claim relating to the confiscation of the personal property from his cell..  For the reasons that follow, all of plaintiff's claims are subject either to dismissal under Rule 12(b)(6) or summary judgment for defendants under Rule 56(b).  The Court should accordingly enter judgment for Defendants, dismissing all of Plaintiff's claims.

## II.   THE CONFISCATION OF THE MONEY ORDER PURSUANT TO A VALID MAIL MONITOR DOES NOT VIOLATE THE FIRST AMENDMENT.

The Plaintiff claims a violation of the First Amendment in relation to the confiscation and letter from Ms. Bates, which contained the $800.00 money order.  Importantly, at no point has the Plaintiff alleged that he was legally entitled to the $800.00.  The Defendants acted wholly appropriately, in accordance with all applicable regulations.

The affidavit of MTC Superintendent Murphy explains the procedure by which inmate mail may be monitored.  *See Exhibit O, Affidavit of Robert Murphy*.  The DOC mail regulations, 103 CMR 481, address the issue of whether incoming and outgoing mail may be inspected

and/or confiscated. The regulation, 103 CMR 481.13(1) and (2) permits the opening and inspection of both outgoing and incoming mail. According to the regulation, if material is confiscated, a contraband notice is to be issued. *Exhibit O,* ¶ 9. The mail regulation also authorizes a Superintendent, in his discretion, to approve a mail monitor for a variety of reasons. It states that, "no employee may read inmate mail unless authorized to do so by the commissioner or the superintendent." *See Attachment 1 to Exhibit O,* 103 CMR 481.14(3). A Superintendent may authorize the "reading of outgoing non-privileged correspondence when, in his opinion, such action is necessary to prevent the transmission of materials and/or information which represents a threat to security, order, rehabilitation or the public safety." *See Attachment 1 to Exhibit O,* 103 CMR 481.14(1).

The regulations also state that "for outgoing mail, such authorization may be granted when the superintendent has received specific information that a particular inmate's mail contains information which may jeopardize institutional security, order, rehabilitation or the public safety." *See Attachment 1 to Exhibit O,* 103 CMR 481.14(2). The regulation contains a list of types of specific types of outgoing mail that may be subject to monitor. *See Attachment 1 to Exhibit O,* 103 CMR 481.14(a) through (j). Finally, the regulation states that, "where outgoing mail is read pursuant to 103 CMR 481.14, and prohibited information is found, the mail or relevant portion thereof may be confiscated. Notice of a confiscation shall be given to the inmate in accordance with 103 CMR 481.17. *See Attachment 1 to Exhibit O*.

The regulation contains a separate section pertaining to reading and censoring non-privileged incoming mail. The regulation states that "the superintendent may authorize the reading, censoring or disapproval of incoming non-privileged correspondence only to prevent interference with institutional goals of security, order, discipline, or if it might facilitate,

encourage or instruct in criminal activity; disapproval shall not be based upon an employees personal views of the merit of such correspondence." *See Attachment 1 to Exhibit O,* 103 CMR 481.15(2). The regulation contains a list of categories of non-privileged correspondence which may not be received by inmates. *See Attachment 1 to Exhibit O,* 103 CMR 481.15(a) through (g).

The Treatment Center Procedural Attachment to 103 CMR 481, also establishes institutional guidelines for the processing of inmate/resident mail. Section VIII of the procedure pertains to the reading of non-privileged inmate mail. *See Attachment 2 to Exhibit O.* The procedure states that

>    a.   The superintendent will be informed both verbally and in writing by the staff person wishing to review inmate/resident mail (incoming and outgoing). The staff person shall be responsible for briefing the superintendent as to the facts surrounding the request.
>
>    b.   Upon the superintendent deeming the facts to be sufficient that the security of the institution, the orderly running of the institution, the physical safety of an individual is threatened or when necessary to protect legitimate governmental interests, he may authorize the reading of non-privileged mail.
>
>    c.   The only person designated to review the inmate/resident mail will be the person designated by the superintendent.
>
>    d.   The authorized staff member reading the inmate/resident mail shall sign the mail monitor logbook and make the appropriate entries regarding the disposition of the mail. The logbook shall be kept in the IPS office.
>
>    e.   The superintendent will be kept informed as to the progress of the reviews as they occur.
>
>    f.   The superintendent will authorize the discontinuation of the mail monitor. The proper entry to reflect the discontinuation will be noted in the logbook.

*See Attachment 1 to Exhibit O.*

According to Superintendent Murphy, he may authorize a mail monitor for a designated period of time. The MTC Inner Perimeter Security Team ("IPS") typically initiates a request for a mail monitor on a particular inmate or resident based on an ongoing investigation. *See Exhibit O*, ¶ 16. The Superintendent authorizes the initial mail monitor and subsequent requests for extensions. *Id*. It is possible that mail may be monitored pursuant to a valid monitor, but not confiscated. *Id*, at ¶ 17. If the mail is confiscated, notice will be given to the inmate/resident. *Id* at ¶ 16.

The United States Supreme Court in *Procunier v. Martinez* unmistakably indicated that reading and censorship of inmate mail is a constitutionally acceptable practice:

> [The] legitimate governmental interest in the order and security of penal institutions justifies the imposition of certain restraints on inmate correspondence. Perhaps the most obvious example of justifiable censorship of prisoner mail would be refusal to send or deliver letters concerning escape plans or containing other information concerning proposed criminal activity, whether within or without prison.

416 U.S. 396, 412-13 (1974).

The *Procunier* Court determined that with regard to the censoring of outgoing inmate mail, the question is whether the censorship furthers "one or more of the substantial governmental interests of security, order, and rehabilitation" and is "no greater than is necessary or essential to the protection of the particular governmental interest involved." 416 U.S. at 413. The Court pointed out that "this does not mean, of course, that prison administrators may be required to show with certainty that adverse consequences would flow from the failure to censor a particular letter. Some latitude in anticipating the probable consequences of allowing certain speech in a prison environment is essential to the proper discharge of an administrator's duty." *Id*. at 414. Furthermore, the Court specifically noted that personal correspondence that included

the following kinds of material, as set forth in Policy Statement 7300.1A of the Federal Bureau of Prisons, could be censored: (1) that which might violate postal regulations, e.g., threats, blackmail, or contraband; (2) that which indicates a plot to escape; (3) that which discusses criminal activities; (4) that which indicates that the inmate is running a business while he is in confinement; or (5) that which contains codes or other obvious attempts to circumvent legitimate prison regulations. *Id*. at 414 n.14.

Here, the Plaintiff was subject to a properly administered mail monitor, which was necessary due to the Plaintiff's ongoing and persistent misuse of the mail system. For example, in February, 2005, the Plaintiff and another MTC resident conspired to alter a check from Massachusetts Correctional Legal Services to Plaintiff. The original sum on the check was $16.85. The check was altered to represent the amount of $12,700. *See Attachment 3 to Exhibit O*. In 2004, the Plaintiff wrote to the Commissioner of the DOC requesting an investigation into money orders that were allegedly not credited to his account. During the investigation, the Plaintiff admitted that the money orders in question were the results of an ongoing tax scam that he was involved in. *See Attachment 4 to Exhibit O*. In short, Superintendent Murphy properly initiated the mail monitor which was in place in April, 2005.[5]

The money order arrived at the MTC in a letter from Lillian Bates on April 1, 2005. *Exhibits C, G*. In addition, two other letters containing money orders addressed to two other MTC residents, R.M. and R.D, arrived at the MTC on that same day.[6] *Exhibit C, G*. These letters

---

[5] The Plaintiff's misuse of the mail system has continued to this day, as detailed in the Defendants' Status Report Regarding Plaintiff's Claims That Documents Were Improperly Siezed; *see* Document No. 83.

[6] At the time the letters were delivered, the Plaintiff and R.M. were on approved mail monitors pursuant to 103 CMR 481.15 – Inmate Mail.

all appeared to come from the same source.[7] *Exhibit C, G*. A review of the telephone records indicated that Lillian Bates was listed in R.D.'s list of phone numbers, where she was identified as his sister. *Exhibit C*. Further, IPS performed an internet search, which revealed Lillian Bates' phone number. *Exhibit C*. That phone number was mentioned in the letter to R.D., and was also listed on the telephone list of another resident, K.B. *Exhibit C*.

In light of the obviously suspicious nature of the money order, it was confiscated. Plaintiff was notified of the confiscation of the letter on April 6, 2005, pursuant to 103 CMR 481.16 (1). *Exhibit P*, Letter from MacEachern to Schmitt, dated April 6, 2005. Ms. Bates was notified of the confiscation the following day. *Exhibit D*. A copy of the letter and money order was kept for the investigation. *Exhibit C, G*. Later, on June 3, 2005, the Plaintiff wrote to Superintendent Murphy requesting that the $800.00 be credited to his account. *Exhibit Q*, Letter from Schmitt to Murphy, dated June 3, 2005. In response, Superintendent Murphy forwarded the letter to then Deputy Waitkevich, with instructions to determine whether the money order had been returned to sender. *Exhibit R*, Memo from Murphy to Waitkevich, dated June 8, 2005. Deputy Waitkevich informed Superintendent Murphy that the money had been returned to sender. *Exhibit S*, Memo from Waitkevich to Murphy, dated June 9, 2005. The Plaintiff was then informed that the money order was returned to sender. *Exhibit F*. As Superintendent Murphy states in his Affidavit, when the MTC confiscates something of monetary value through incoming mail, such items are photocopied and the original items are returned to sender. *Exhibit O*, ¶ 22. The reason for this is because such items may lose value or become invalid after a

---

[7] The letter to the Plaintiff had a return address of "Lillian Bates, 20 East. St., Attleboro, MA, 02703," and contained a money order for $800.00. The letter to R.M. had a return address of "L. Bates, 20 East. St., Attleboro, MA 02703," and contained a money order in the amount of $200.00. The letter to R.D. had a return address of "Mrs. Evelyn D., 31 School St., Taunton, MA 02780," and contained two money orders, one for $1,000.00 and one for $400.00. All of the letters were written on the same type of stationary, and with the same handwriting. All four of the money orders were purchased at the same post office (no. 027800) on the same day (March 31, 2005). *Exhibit C*.

certain amount of time, and the MTC does not want to deprive the sender of such items of the value of the items. *Exhibit O*, ¶ 22.

Importantly, the Plaintiff has never claimed that he is entitled to the money order. Through discovery, he was asked, "Describe in detail your relationship with Lillian Bates, specifically including any financial or business relationships." *Exhibit H*. He responded, "Above and beyond the fact that Mrs Lillian Bates sent $800.00 to Plaintiff Joseph Schmitt said Plaintiff stands soundly on his 5th Amendment as guaranteed to him by the defendants reading him his Maranda Rights on one or more occasions." (errors in original) *Exhibit H*. Thus, for the purposes of this civil action, by refusing to answer this interrogatory on the grounds that such an answer may incriminate him, the Plaintiff is admitting that his relationship with Ms. Bates is criminal in nature. The Plaintiff does not have a First Amendment right the proceeds of a criminal enterprise, especially one that is run through the inmate mail system.

Nor has the Plaintiff suffered any harm from the confiscation of the money order. If the "gift" was legitimate, and not the proceeds of a criminal scheme, Ms. Bates could have simply obtained another money order, and sent it to the Plaintiff at a later date.

In conclusion, the Plaintiff's mail has been, and continues to be handled in accordance with DOC regulations and procedures. The confiscation and return of the money order was conducted pursuant to all appropriate regulations. The Plaintiff does not allege that the DOC mail regulations are unconstitutional. For the foregoing reasons, the Plaintiff's First Amendment claims regarding the confiscation of the money order must be dismissed.

### III. THE CONFISCATION AND RETURN OF THE MONEY ORDER DID NOT VIOLATE PROCEDURAL DUE PROCESS.

In its March 30, 2009 order, the Court writes:

> Here, there were regulations in place to provide for a pre-deprivation process, for both the handling of the money (103 Mass. Code Regs. 405) and Schmitt's personal property (103 Mass. Code Regs. 403). Thus, the issue is whether the failure to adhere to the pre-deprivation process was random and unauthorized or not. Schmitt's money order was returned to sender instead of being held pending investigation or forwarded to the superintendent and credited to his account per 103 Mass. Code Regs. 405.15.

The portion of the regulations cited by the Court, specifically 103 CMR 405 - <u>Inmate Funds</u>, does not constitute a pre-deprivation process for the purposes of a procedural due process analysis. Further, even if 103 CMR 405.15 did create a pre-deprivation process, such a process does not apply to the facts of this case.

When the state deprives an individual of property, there must be a process by which that deprivation is reviewable. In some instances, the availability of a state-provided post-deprivation remedy (e.g., state tort law) forecloses § 1983 as a remedy. If the deprivation is not the result of some established policy or procedure, and the state cannot predict precisely when the deprivation will occur, it is enough that post-deprivation remedies are available. *Parratt v. Taylor*, 451 U.S. 327, 330-331 (1981)(overruled in part by *Daniels v. Williams*, 474 U.S. 344 (1986) and *Hudson v. Palmer*, 468 U.S. 517 (1984); *Brown v. Hot, Sexy and Safer Productions, Inc.*, 68 F.3d 525, 535 (1st Cir. 1995)(no § 1983 claim lies for "random and unauthorized" conduct of state officials because the state cannot "anticipate and control [such conduct] in advance."); *Reid v. State of N.H.*, 56 F.3d 332, 336 n.8 (1st Cir. 1995)(no § 1983 claim lies for procedural due process violation given adequate state-law remedy); *Temple v. Marlborough Division of the District*

*Court Department*, 395 Mass. 117, 120 (1985). In *Parratt*, a prisoner brought a § 1983 action against prison officials alleging deprivation of property without due process because prison staff lost his mail order hobby material delivered to the prison. Although this prisoner asserted a deprivation of property by persons acting under color of state law, he did not state a § 1983 claim for a variety of reasons, including that the state had an adequate post-deprivation procedure which could have compensated the prisoner, and which was sufficient to satisfy the requirements of due process. Obviously, since the loss was unpredictable, the court focused on the post-deprivation element of due process. In *Watson v. Caton*, 984 F.2d 537 (1st Cir. 1993), the Court rejected a prisoner's § 1983 claim that a correction officer destroyed contraband property received by the mail without the prison notifying the prisoner and providing a "non-allowable property sheet," which the prisoner alleged was "normally issued" in such situations. 984 F.2d at 539. Because the complaint alleged that the officer acted on his own, suggesting a deviation from and not a reflection of state policy, the claim had no basis under § 1983. 984 F.2d at 541.

The *Parratt-Hudson* doctrine applies to both negligent and intentional acts of state officials. *Hudson*, 468 U.S. at 533, 104 S.Ct. at 3203-3204; *Brown v. Hot, Sexy and Safer Productions, Inc.*, 68 F.3d at 536.

The *Parratt* argument will not apply when the loss is predictable, pre-deprivation process is available and the state delegated the power and authority to effect the deprivation. *Zinermon v. Burch*, 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). In *Zinermon*, a psychiatric patient stated a § 1983 claim that he was hospitalized and treated for a five month period as a "voluntary" patient, even though he was incompetent and incapable of giving informed consent to admission and treatment. He contended that the defendants had a pre-deprivation process available, involuntary civil commitment, and that they violated his rights by failing to utilize it.

He also contended that it was foreseeable that persons seeking treatment could be incompetent, and that the deprivation would occur at a certain predictable point; i.e., when he signed his admission papers.  Finally, the state had delegated power to hospital staff to effect the deprivation of liberty, subject to a concomitant duty to initiate the procedural safeguards, the involuntary civil commitment process.

     Here, there was a pre-deprivation process: the mail monitor process.  As explained in Superintendent Murphy's affidavit, incoming mail can only be examined and read in certain situations, and always with the Superintendent's pre-approval. *Exhibit O*.  The mail monitor procedures for the review and confiscation of incoming mail indicate "The superintendent may authorize the reading, censoring or disapproval of incoming non-privileged correspondence only to prevent interference with institutional goals of security, order, discipline, or if it might facilitate, encourage or instruct in criminal activity…." *Attachment 1 to Exhibit O*, 103 CMR 481.15.  Here, the Plaintiff was suspected of engaging in criminal activity involving the filing of fraudulent tax returns.  *See Exhibits B, O*.  IPS Officer Clauss properly requested a mail monitor in order to prevent the further commission of criminal activity. *Exhibit A*.  Superintendent Murphy, having determined "the facts to be sufficient that the security of the institution, the orderly running of the institution, the physical safety of an individual is threatened," approved the mail monitor for a period of 90 days. *Exhibits A, O, Attachment 2 to Exhibit O*.  This pre-deprivation procedure was and is more than sufficient to protect the Plaintiff's rights related to incoming mail.

     Further, the provisions of the Inmate Funds regulations do not apply to this situation.  The regulation cited by the Court reads:

> Any money found in the possession of an inmate which is in
> excess of an amount authorized by the Superintendent shall be

>confiscated, and a disciplinary report written.  The contraband
>shall be forwarded to the Superintendent who shall insure the
>money is credited to the inmate's savings account.

103 CMR 405.15.  This provision does not apply to the case at bar because the Plaintiff was never in possession of the money order in question.  This provision envisions a scenario where an inmate is found to be in physical possession of currency while in a DOC institution.  Here, the money order was intercepted before the Plaintiff ever possessed it.  In order for 103 CMR 405.15 to apply in this case, the DOC administration would have had to allow the money order to go to the Plaintiff, so he could sign it, and then DOC would have had to credit the money order to the Plaintiff's account.  This would have been an absurd result, given that the whole point of the mail monitor was to prevent criminal activity.  Since 103 CMR 405.15 does not apply, the money order was handled like any other contraband pursuant to the mail regulations. *Exhibit O*.

As the Defendants complied with all applicable regulations, and there is no material dispute of facts, the Plaintiff's procedural due process claim relating to the confiscation of the money order must be dismissed, or summary judgment for the Defendants should be entered.

**IV.    THE MAY, 2005 CONFISCATION OF VARIOUS ITEMS FROM THE PLAINTIFF'S CELL DID NOT VIOLATE PROCEDURAL DUE PROCESS.**

On May 17, 2005, at the conclusion of an IPS interview about a fraudulent MCLS check (*See Exhibit I, Attachment 3 to Exhibit O*), the Plaintiff invited IPS to search his cell for evidence in support of his claims that he was being extorted by other MTC residents. *Exhibit I*.  The search uncovered various items of contraband, including tax forms, personal information, including social security numbers of other MTC residents, and pictures from magazines and other sources depicting children, some in various states of undress. *Exhibits I, J*.  The Plaintiff was notified of the search on May 20, 2005, and was later provided with an itemized list of confiscated items on July 11, 2005. *Exhibits K, N*.

All of the confiscated items are contraband, and the Plaintiff is not entitled to possess them. *Exhibit O*, ¶ 28. The items have been held by IPS since they were confiscated. On November 25, 2009, Superintendent Murphy conferred with the MTC Director of Security, Sheila Smith, who confirmed that the items are contraband, and no longer required to be kept. *Exhibit O*, ¶ 30. Under the DOC Search Policy:

> Final disposition of all evidence shall be approved in writing by the director of security. Final disposition of evidence relating solely to a disciplinary or civil matter and not involving any possible criminal prosecution shall be approved in writing by the department's general counsel. All evidence related to a disciplinary matter shall be held for three years from the initial sanction date to ensure that no civil action has been brought against the department. Thus, evidence relating to a disciplinary matter that is less than three years from the initial disciplinary sanction date, shall not be submitted to the department's general counsel for approval. After the three year period has lapsed, then approval to destroy evidence through the general counsel shall be obtained.

103 DOC 506.10 (2).[8] A description of the confiscated items was provided to the General Counsel on November 25, 2009. *Exhibit K*, ¶ 30. Once written approval for final disposition of the confiscated items is obtained by the General Counsel, the Plaintiff will be given the option of how he would like the items disposed of, pursuant to 103 CMR 403.14 (1), which states:

> (1) Within one week of property being deemed contraband, the Property Officer at the facility temporarily storing the contraband shall initially notify the inmate of the item being stored by a contraband notification form. The inmate may elect to dispose of the items by one of the following methods:
>     (a) have the property retrieved by a visitor;
>     (b) have the property mailed out to a specified destination;
>     (c) have the property disposed of as seen fit by the institution.

---

[8] The DOC Search Policy, 103 DOC 506, relates directly to security procedures within DOC facilities and has been deemed private by the Commissioner of the DOC. As production of such material to an incarcerated sex offender would jeopardize the safety of staff, visitors, residents and inmates as well as the public, a copy of the policy has not been attached as an exhibit. Upon request, Defendants will provide a copy to the Court.

Thus, the Defendants have complied with all proper procedures concerning the search of the Plaintiff's cell, **which he initiated**, on May 18, 2005.  Any delay in obtaining final approval for disposition of the items was harmless to the Plaintiff, as the items were subject to this lawsuit, and were contraband.

As the Defendants complied with all applicable regulations, and there is no material dispute of facts, the Plaintiff's procedural due process claim relating to the May 18, 2005 search of his cell must be dismissed, or summary judgment for the Defendants should be entered.

V. **EVEN ASSUMING THAT THE DEFENDANTS FAILED TO COMPLY WITH REGULATIONS, SUCH A FAILURE DOES NOT CREATE A FEDERALLY PROTECTED CONSTITUTIONAL RIGHT.**

The Defendants properly complied with all applicable regulations in this case.  Even assuming, however, that at some point there had been a technical failure to adhere to the applicable regulations, such failure does not create a federally protected constitutional right.  Courts have consistently held that, even where a liberty interest is potentially at issue, the failure of prison officials to comply with state regulations does not create a constitutional right. *See Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003); *Ewell v. Murray*, 11 F.3d 482, 488 (4th Cir. 1993); *Shango v. Jurich*, 681 F.2d 1091, 1101 (7th Cir. 1982).  The Eighth Circuit explained that a prisoner's constitutional rights are not found in state law:

> In essence, Kennedy claims a federal constitutional liberty interest in having state officers follow state law. But in making this claim, Kennedy misinterprets the nature of procedural due process. If Kennedy has a liberty interest, it is an interest in the nature of his confinement, not an interest in the procedures by which the state believes it can best determine how he should be confined. See *Olim v. Wakinekona*, 461 U.S. 238, 250, 103 S.Ct. 1741, 1748, 75 L.Ed.2d 813 (1983) ("Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement."); *Griffin-El v. Delo*, 34 F.3d 602, 604 n. 3 (8th Cir.1994) (inmate does not have a liberty interest in a particular procedure). The Due Process Clause

>of the Fourteenth Amendment, not state law, governs the
>procedures which the state must follow in depriving Kennedy of a
>substantive liberty interest. *See Vitek v. Jones*, 445 U.S. 480, 491,
>100 S.Ct. 1254, 1262-63, 63 L.Ed.2d 552 (1980); *Brown v. Frey*,
>889 F.2d 159, 166 (8th Cir.1989) ("[T]he court's inquiry is not
>whether the [state] statute and therefore the Constitution is violated
>but whether the process afforded plaintiff 'satisfied the minimum
>requirements of the Due Process Clause.' ") (quoting *Hewitt*, 459
>U.S. at 472, 103 S.Ct. at 871-72), *cert. denied*, 493 U.S. 1088, 110
>S.Ct. 1156, 107 L.Ed.2d 1059 (1990).

*Kennedy v. Blankenship*, 100 F.3d 640, 643 (8th Cir. 1996).

Here, the best that the Plaintiff can argue is that he had a property interest (something certainly of lesser import than the liberty interest discussed above) in the money order and the confiscated items. But as set forth, *supra*, the Plaintiff never had any entitlement to possess either the money order or the confiscated items. Indeed, the money order was sent to the Plaintiff in furtherance of a criminal enterprise, and the confiscated items are all contraband. The Plaintiff has stated not constitutional claim, and summary judgment should enter in the Defendants' favor.

## **CONCLUSION**

The Plaintiff has no First Amendment right to receive the proceeds of a criminal enterprise. By following all applicable regulations, the Defendants provided the Plaintiff with procedural due process sufficient to protect his rights, both in connection to the money order and the search of his cell. The Plaintiff has not alleged that the DOC regulations are unconstitutional. Finally, even if there had been a technical violation of the regulations, a point which is not supported by the evidence, such a failure to comply with state law does not create a federally protected constitutional right in the Plaintiff. There is no material dispute as to these facts. Accordingly, the Plaintiff's remaining claims must be dismissed, or summary judgment must be entered in the Defendants' favor.

Respectfully Submitted

by Defendants Murphy, Clauss, Waitkevich, and MacEachern,

NANCY ANKERS WHITE
Special Assistant Attorney General


by:    s/ BRENDAN J. FRIGAULT
Brendan J. Frigault, Counsel
BBO No. 647669
Department of Correction
Massachusetts Treatment Center
30 Administration Road
Bridgewater, Massachusetts 02324
(508) 279-8185
Dated: November 25, 2009        FAX: (508) 279-8181


## CERTIFICATE OF SERVICE

I hereby certify that I caused a true copy of the attached document to be served upon the Petitioner through intra-facility mail.

Joseph Schmitt, M81137
Massachusetts Treatment Center
30 Administration Rd.
Bridgewater, MA 02324

s/ BRENDAN J. FRIGAULT
Brendan J. Frigault

Dated: November 25, 2009